STATE OF NEBRASKA, APPELLANT, V. DANNY MCDOWELL, APPELLEE.

488 N.W.2d 593

Filed May 19, 1992.   No. A-92-105.

Charles W. Campbell, York County Attorney, for appellant.

James H. Truell, York County Public Defender, for appellee.

CONNOLLY, Judge.

Danny McDowell was charged with possession of marijuana weighing more than 1 pound. See Neb. Rev. Stat. § 28-416(7) (Reissue 1989). Before trial, McDowell moved for suppression of an oral statement on the grounds that the police had obtained the statement in a custodial interrogation without advising him of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The district court sustained the motion to suppress, and the State appeals the order, as

authorized by Neb. Rev. Stat. § 29-116 (Supp. 1991).

The facts are as follows: At approximately 5:45 p.m. on July 13, 1991, James Brady, a trooper and state deputy sheriff for the Nebraska State Patrol, was on his way to work. He received a radio dispatch from the office in Grand Island to look for a white Cadillac with California license plates headed westbound from Lincoln at about 5 p.m. The dispatch indicated that the occupants of the Cadillac had been throwing beer cans out the windows of the vehicle.

Ronald D. Murtaugh, a police officer for the city of York, testified that at 5:45 p.m. on July 13, he was patrolling the south portion of the York city limits. He proceeded to patrol the York interchange area and the food establishments in the area for the Cadillac. Approximately 2 to 3 minutes after receiving the broadcast, he saw a vehicle matching the description on the south side of the Kentucky Fried Chicken restaurant. Officer Murtaugh then passed this information on to Trooper Brady, who had parked his vehicle and was on a traffic stop at the interchange.

Trooper Brady drove to the restaurant to observe the vehicle, which at the time was unoccupied, and then contacted Murtaugh and told him that he would wait for the occupants to return to the Cadillac before he made contact. Brady then drove back to the restaurant and radioed Murtaugh for assistance.

Murtaugh positioned himself behind the Cadillac on the passenger side. Brady approached the driver and inquired who the Cadillac's owner was. The person in the front passenger seat was Joyce Rhoades, but she identified herself as Shirley Hogan. She stated that the automobile was owned by her sister, Joyce Rhoades.

When asked who had been driving, the man in the driver's seat, who identified himself as Jerry Martin, directed the trooper to McDowell, who was exiting the restaurant. Brady then asked the occupants to exit the Cadillac and demanded driver's licenses. Trooper Brady ascertained that McDowell was the only one with a valid driver's license, but that McDowell had had too much alcohol to drive. Brady therefore advised them to wait for McDowell to sober up before proceeding.

Murtaugh then observed a package of Zig Zag cigarette

papers in plain view inside the automobile. Suspecting the presence of marijuana, Trooper Brady asked McDowell whether he might search the vehicle, and McDowell consented. Trooper Brady found nothing inside the vehicle. He then took the keys from the ignition and searched the trunk, in which he found several recently harvested marijuana plants. Brady informed the group that they were all under arrest and directed them to a grassy area behind the restaurant. The occupants were told to lie down prone in the grass.

Officer Murtaugh testified that as he was keeping watch over the group lying in the grassy area, McDowell looked up and told him that the marijuana was his and that he would take the officers back to Iowa to show where he had picked it. Murtaugh testified that he did not ask McDowell any questions before McDowell made these statements.

Aretha Victoria McDowell, the wife of defendant McDowell, testified that after Brady found the marijuana, she was asked to lie down with the others. Her 2-year-old daughter then came beside her where she lay beside her husband. She testified that Brady asked Murtaugh to call social services to take away the McDowells' daughter. According to Aretha McDowell, Danny McDowell then asked the officers not to take his wife and baby and claimed the marijuana was his.

McDowell filed a motion to suppress the results of the search and the statement, pursuant to Neb. Rev. Stat. § 29-115 (Reissue 1989), claiming that he was subjected to custodial interrogation without an antecedent *Miranda* warning. The court sustained the motion to suppress the statement and overruled the motion to suppress the search. On this appeal, the motion to suppress the search is not an issue.

The trial court specifically found as follows:

After finding the marijuana Trooper Brady immediately placed <u>all</u> of the parties under arrest and forced them into a prone face down position in the grassy area behind the Kentucky Fried Chicken restaurant; he then locked the vehicle and announced that the vehicle would be towed; and he then announced to Officer Murtaugh that the Nebraska Department of Social Services should be contacted and directed to pick up the 2

year old child.

No Miranda warnings were given to any of the occupants following their arrests.

After he announced that Social Services should be directed to pickup up [sic] the 2 year old child the defendant then stated to both Trooper Brady and Officer Murtaugh that the marijuana was his and he had harvested the marijuana near Atlantic, Iowa.

(Emphasis in original.)

The court made the following conclusions of law:

It is clear from the evidence that neither Trooper Brady or Officer Murtaugh gave any Miranda warnings to the defendant before the defendant made the statements. The arrest of the defendant's wife, child and others from the vehicle and the threat to remove the child from her mother were coercive maneuvers that prompted the admission by the defendant and as such violated his Fifth and Sixth Amendments [sic] rights. Defendant's statements were not freely and voluntarily given. The failure to advise the defendant of his constitutional rights at the time of his arrest violated the same.

On appeal, the State assigns as error the district court's finding that the statements made by the defendant violated the defendant's Fifth and Sixth Amendment rights.

In determining the correctness of a trial court's ruling on a motion to suppress, this court will uphold a trial court's findings of fact unless those findings are clearly erroneous. *State v. Pope*, 239 Neb. 1009, 480 N.W.2d 169 (1992).

In deciding whether the trial court's findings on a motion to suppress are clearly erroneous, the reviewing court recognizes the trial court as the trier of fact and takes into consideration that the trial court has observed the witnesses testifying regarding the motion. *Id.*

The district court found that McDowell's Fifth and Sixth Amendment rights had been violated. The issue whether the defendant, McDowell, was interrogated arises under the Fifth Amendment to the U.S. Constitution, which provides "nor shall [any person] be compelled in any criminal case to be a witness against himself . . . ." The Sixth Amendment provides:

"In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."

The Nebraska Supreme Court has held:

> Before a defendant's custodial statement is admissible as evidence, the absolute and indispensable prerequisites of the *Miranda* warning must have been satisfied preceding the interrogation producing such statement, namely, law enforcement personnel must (1) inform the defendant of the right to remain silent, (2) explain that anything said can and will be used against the defendant in court, and (3) inform the defendant of the right to consult with a lawyer and to have a lawyer present during interrogation.

*State v. Norfolk*, 221 Neb. 810, 814-15, 381 N.W.2d 120, 125 (1986).

In *State v. Bodtke*, 219 Neb. 504, 508-09, 363 N.W.2d 917, 921 (1985), the Nebraska Supreme Court stated:

> *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), formulated prerequisites for admissibility of a suspect's in-custody statement(s) obtained "in a police-dominated atmosphere, resulting in self-incriminating statements," *id*. at 445, and sought to minimize the psychological advantage frequently inherent in an exercise of governmental authority as a tool for coercion, that is, the "potentiality for compulsion." *Id*. at 457. "Custodial interrogation" has been characterized by the U.S. Supreme Court in *Miranda* as "questioning instigated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. at 444.

This passage makes clear that antecedent *Miranda* warnings are required only when two conditions are satisfied: (1) the defendant is in custody and (2) the defendant is subjected to interrogation.

In the present case, it is undisputed that McDowell was in custody. The next question is whether he was interrogated by the police.

> The starting point for defining "interrogation" in this context is, of course, the Court's *Miranda* opinion. There

the Court observed that "[b]y custodial interrogation, we mean *questioning* initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."
*Rhode Island v. Innis*, 446 U.S. 291, 298, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).

Although there was no express questioning by police of McDowell in this case, the U.S. Supreme Court has held that "interrogation" includes more than express questioning. In *Rhode Island v. Innis*, 446 U.S. at 300-01, the Court stated:

We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

Therefore, under *Innis*, interrogation within *Miranda*'s requirements applies (1) to express questioning or (2) to the "functional equivalent" thereof.

In *State v. Gibson*, 228 Neb. 455, 463-64, 422 N.W.2d 570, 575 (1988), the Nebraska Supreme Court suggested the following interpretation of the *Innis* functional equivalent test:

As we interpret *Innis, supra*, to determine whether there is interrogation within the meaning of *Miranda*, an objective standard is applied: Would a reasonable and disinterested person conclude that police conduct, directed to a suspect or defendant in custody, would likely elicit an incriminating response from that suspect or defendant? See 1 W. LaFave & J. Israel, Criminal Procedure § 6.7 (1984). If the answer is "yes," there is interrogation requiring the *Miranda* warning before a defendant's incriminating response is constitutionally admissible as evidence against the defendant.

According to *Innis*, some factors which may be considered in determining whether there has been interrogation within the meaning of *Miranda* are a police

practice designed to elicit an accused's incriminating response and a defendant's susceptibility to respond to a particular persuasion.

Thus, the functional equivalent test under Nebraska law is to be applied objectively, and not by considering the subjective perception of the suspect. The test takes the point of view of a reasonable and disinterested observer with the same knowledge of the suspect as the police officer has, and asks whether that observer would infer, on the sole basis of hearing the officer's remarks, that the remarks were designed to elicit an incriminating response. See 1 Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 6.7(d) (1984).

In this case, the district court did not conclude that the words and actions of the officers were the functional equivalent of interrogation. Moreover, the court's finding of facts does not address the relevant inquiries. In the absence of a finding that McDowell had been interrogated, the court's conclusion that McDowell's Fifth Amendment rights had been violated is clearly wrong.

It therefore remains to be determined in this appeal whether the conduct of the officers was the functional equivalent of interrogation. The question under Nebraska law is: Would a reasonable and disinterested person conclude that the remark of Trooper Brady to Officer Murtaugh concerning contacting social services to pick up the child, directed to McDowell, would likely elicit an incriminating response from him?

The answer in this case must be "no." A factor to be considered under *State v. Gibson* is whether this was a police practice designed to elicit an incriminating response. The conversation occurred between the two officers, and the remark was not addressed to McDowell. The record contains no testimony showing that Brady's remark to Murtaugh was part of a concerted "psychological ploy" to elicit a response from McDowell. There is no testimony to show that the officers were aware of and taking advantage of McDowell's concern for his child. Far from being a threat, Brady's remark was the kind of remark that an officer would normally make in carrying out his duties under the circumstances.

A further factor to be considered under *State v. Gibson* is

whether the defendant was susceptible to persuasion of this sort. The record contains no testimony that the defendant, McDowell, was especially susceptible to this sort of persuasion. Although McDowell had been drinking, he was not incapacitated. McDowell was the recipient of a single isolated remark, and the record contains no testimony to show that McDowell was emotionally upset or overwrought.

" 'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Innis*, 446 U.S. at 300. The acts of the police in this case do not rise to a level of compulsion sufficient to constitute interrogation.

However, the record does show that after McDowell made a statement to Murtaugh, Brady then asked McDowell if there was something he wanted to say. *Innis* does not prohibit such followup questions. See 1 LaFave & Israel, *supra*, § 6.7(d). Therefore, McDowell's answer to Brady's question was a continuation of his volunteered statement, and the officers were not required to advise him of his *Miranda* rights at that time.

Since the facts as found by the court were insufficient to find the defendant had been interrogated, there is no basis for the court's conclusion that McDowell's Fifth Amendment rights had been violated. And since the police had not interrogated McDowell, his Sixth Amendment right to counsel had not attached. The conclusion of the district court was therefore clearly erroneous.

The next issue to be addressed is whether McDowell's statement was voluntary. Whether a defendant's custodial statement is voluntary is a question concerning the constitutional safeguard of due process.

The Supreme Court has held that "a 'spontaneously volunteered statement' of a suspect or defendant is admissible in the absence of a *Miranda* warning." *Gibson*, 228 Neb. at 464, 422 N.W.2d at 575-76 (quoting *State v. Red Feather*, 205 Neb. 734, 289 N.W.2d 768 (1980)).

The Supreme Court also has stated that "the State must show that the statement, admission, or confession of the accused was given freely and voluntarily and was not the product of any

promise or inducement, direct or implied, *no matter how slight*, before it will be admitted into evidence." (Emphasis in original.) *State v. Haynie*, 239 Neb. 478, 485, 476 N.W.2d 905, 911 (1991).

In *Haynie* the court made clear that this test was not to be applied as a per se rule, but that " 'determinations of voluntariness are based upon an assessment of all the circumstances and factors surrounding the occurrence when the statement is made. . . .' " *Id*. at 486, 476 N.W.2d at 911 (quoting *United States v. Grant*, 622 F.2d 308 (8th Cir. 1980)). See, also, *State v. Melton*, 239 Neb. 506, 476 N.W.2d 842 (1991).

The Due Process Clause of the 14th Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1.

By its very terms the Due Process Clause requires state action. In the realm of coerced confessions, state action must be found in the form of police conduct. See *Brown v. Mississippi*, 297 U.S. 278, 56 S. Ct. 461, 80 L. Ed. 682 (1936).

"Coercive police *conduct* is a necessary predicate to the finding that a confession is not voluntary within the meaning of the due process clause of the 14th amendment." (Emphasis supplied.) *Haynie*, 239 Neb. at 490, 476 N.W.2d at 913.

This requirement was explained in *Colorado v. Connelly*, 479 U.S. 157, 163-64, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986):

Thus the cases considered by this Court over the 50 years since *Brown v. Mississippi* have focused upon the crucial element of police overreaching. While each confession case has turned on its own set of factors justifying the conclusion that police conduct was oppressive, all have contained a substantial element of coercive police conduct. Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.

See, also, *State v. Hankins*, 232 Neb. 608, 441 N.W.2d 854 (1989).

A determination by the trial court that a confession was made voluntarily will not be overturned on appeal unless

clearly wrong. *Haynie, supra.*

In this case the trial court did not make sufficient findings to show that McDowell's will was overborne as a result of coercive *conduct* of the police. The testimony of the officers shows that McDowell was not promised anything, threatened, or subjected to any other improper influence. The record does not show that McDowell had been subjected to a level of coercion greater than that inherent in custody itself. The fact that the custodial environment surrounding McDowell's statement was coercive is insufficient to support the conclusion that McDowell's admission was causally related to conduct by the police.

Since the facts were insufficient to show coercive conduct on the part of the police, the district court's conclusion that McDowell's statement was involuntary was clearly wrong.

The judgment of the district court is reversed.

REVERSED.